Bidnick v. DOJ 2015-3169, Mr. Maycomber, when you are ready. Thank you, Your Honor. May it please the Court, my name is Michael Maycomber, I represent the appellant in this matter, Bradford Bidnick. There's two issues on appeal that really need consideration today. The first being the Giglio impairment and the agency's misinterpretation of the Giglio standard in determining the reasonableness of the penalty, as well as the harmful procedural error that was conducted below. With respect to the first argument, the agency has a burden to establish in sustaining any kind of misconduct. First, they have to establish that the misconduct occurred, that there's a nexus to the actual job duties of the individual, and that there's reasonableness to the penalty, that the penalty is proportionate to the offense here. Here, when the agency reached the ultimate issue as to the reasonableness of the penalty in removing Mr. Bidnick from federal employment, it erred by misinterpreting the Giglio standard. The administrative judge and the MSPB continue to follow that same misinterpretation of the case law in finding that the nature and seriousness of the offense warranted removal in this case. Now, what is Giglio impairment, which I must say I haven't seen before, but apparently it affects the ability of this individual to testify and have his credibility accepted because of his past actions. A Giglio impairment is, I guess, a term of art used by the agency's Department of Justice, United States Attorney's Office, to refer to a federal law enforcement officer that has some sort of Giglio impeachment evidence in their record that has to be turned over to the defense. It's an extension of Brady v. Maryland there, that exculpatory impeachment evidence has to be turned over to the defense in a criminal prosecution. You're impeaching the character of the witness, is that the idea, rather than anything related to the specific case that's under review, is that correct? Exactly. It has to deal with... And so the idea is that the witness would be subject to an unhappy cross-examination, is that what's going on here? Yes, that is what's going on here, but it is not just any impeachment. The case law and even the United States Attorney's own policy states that it has to be that type of evidence that will have a substantial likelihood of affecting the accuracy of the witness's testimony. Not all impeachment evidence is going to affect the credibility of the officer. We can assume that there's a sliding scale of possible impeachment evidence. You have a criminal conviction for perjury on one end of the scale, which is going to be pretty much impossible to overcome. And you might have simple little things like traffic tickets, administrative actions, things of that nature, which could be disclosable. But it may have absolutely no reliability as to the accuracy of that officer's testimony. Isn't that within the discretion of the agency? I disagree, no. I think it's actually in the discretion of the United States Attorney's officer. The case law is very clear. That determination rests with the prosecutor. It's a balancing. The agency is not in a position to evaluate that. But the agency doesn't want to run the risk that that discretion will be exercised by the prosecutor to ruin the case of the agency. As I indicated before, yes, there's risk. Any type of misconduct could create risk. If we were to accept the agency's arguments as true, any misconduct would become a giglio impairment for any federal law enforcement officer. You have a single incidence of being AWOL, that could affect your credibility. You can't follow the agency's own policies. Ultimately, the decision is that of the prosecutor. But don't you think the agency has some interest in making sure that its investigators are more or less free of harmful cross-examination? I think the agency certainly has an interest at that point in time. But like I said before, there are varying degrees of impeachment evidence. There's a myriad of job duties that a criminal investigator that could handle. This type of evidence would have absolutely zero impact on their federal law enforcement career. And to bar a federal employee from this type of work for the rest of their career based upon a single inconsequential incident is inequitable in this nature. And that's where we get back to Douglas. The agency's decision, the deciding official indicated that given the severity of this offense, all other factors as considered by Douglas will have no bearing. That the individual, that Mr. Bidnick's potential for rehabilitation is not even relevant based on the facts of this single incident. And that was an error in this case. Mr. Bidnick has a decision, and as referenced in the decision itself and the testimony of the deciding official, he has a very distinguished history of federal employment, working with law enforcement agencies. He even presented exemplary letters of recommendation from numerous witnesses in the proposal stage. He's a marine reservist. He's got an unblemished history, no disciplinary actions whatsoever. But he cheated on an exam. The single charge against him was there was a single violation of the agency's honor code policy. And that was what was the charge that was sustained below. And that may have been misconduct as determined by the agency and the administrative judge. But that should not be so severe as to end the Douglas analysis altogether. Sounds like a weighing. Exactly. And that's what Douglas considers. It's a weighing. And here the agency went too far. Their weighing was completely unreasonable given the facts and circumstances of this case, based on the incorrect interpretation of Giglio. Do I remember seeing something in the record or somewhere that a violation of the trainee honor code had a specific remedy spelled out? You got thrown out of the training program? No. Am I mistaken about that? If you look at the honor code, which is set forth in the supplemental appendix, it discusses a range. And it goes from, I believe, informal counseling to removal. Exactly what Douglas considers. It is a range of penalties that are available there. And what this court and what the MSPB should have done is take a look at this and said, you know what, your interpretation of number one, the nature and the seriousness of the offense, which case law said that is one of the most important factors we look at in this balancing, was incorrect. You erred at that point in time in trying to understand Giglio. At that point, this should have been sent back when you consider all of the other evidence that shows the potential rehabilitative effects of Mr. Bidnick in this case. Well, now you started out noting that a conviction for perjury would clearly be a Giglio, Giglio, Jiglio. I think it's Giglio. Giglio, a Giglio-type problem. Why wouldn't a, quote, conviction, I'll use that loosely, why wouldn't a conviction for cheating have the same quality as a conviction for perjury? Like I said before, I think it is a sliding scale. You know, I use the criminal conviction for perjury. But why aren't they within the range of the slide, given cheating isn't that different from perjury, is it? I think if you look at the deciding official's own testimony, he indicates that it is generally the agency's policy to follow the concept of progressive discipline, first warning, second warning, things of that nature. Here, you know, this is certainly the potential for Giglio evidence. It may be discoverable in a criminal proceeding, but that doesn't mean it is necessarily going to impair the officer's testimony in the proceeding. As I said before, there are a lot of job duties that criminal investigators handle that would have absolutely no bearing on this type of evidence. And the judge, in a district court criminal conviction or criminal case, may properly exclude that evidence, but it's not the agency's determination. That is the determination, first, of the prosecutor, as to whether or not that information is, in fact, disclosable. And second of all, whether or not it's even admissible. And that's the judge's determination at that point in time. I think the second problem we have here is the harmful error analysis. And the agency— I'm going to ask you, for that issue we're looking, what is the standard of view? Aren't we looking at whether there's substantial evidence to support the board's findings in this case? I mean, so the question is whether there's substantial evidence to support the board's view that he is Giglio impaired or that he could be Giglio impaired. My understanding is whether or not—for the substantial evidence standard— is whether or not there's substantial evidence to support the underlying charge. And at the board level, it's a preponderance of the evidence. Unfortunately, in review, it's the substantial evidence standard, which, as you can see from our briefs, we're not arguing that here today. The preponderance of the evidence standard, the board satisfied, and that lesser evidentiary burden of substantial evidence, whether or not the misconduct occurred, that is the review here. And for the harmful procedural error analysis, we need to look at, one, was there procedural evidence, procedural error, and two, would it have affected the outcome of this case? Don't we have cases that say that the board's not required to look at every Douglas factor? Certainly. And so what's the difference here? The difference here is, as I indicated before, the first factor is one of the most important factors, and that's what it is. Douglas sets forth 12 or 13 factors. Number one is the nature and the severity of the action. Here, the deciding official, the administrative judge, the board said, the nature and seriousness of this offense was so egregious that we're not even going to consider the rest of them. There's case law out there that says you do not have to do a formalistic analysis of all 12 factors. There is a balancing of those. But because the agency and the administrative judge and the board incorrectly interpreted Giglio, they didn't do a proper weighing at that point in time. They didn't look at any of these other factors, such as his federal history, his potential for rehabilitation, his clean record, all of those things should have been. The key might be whether they correctly interpreted Giglio. Excuse me? I mean, if we disagree with you on whether they correctly interpreted Giglio, then you might agree that there wasn't any need to consider the other factors because there couldn't be rehabilitation. Even that, I disagree. I think with respect to the rehabilitation aspect, to say that just because of a single violation of an Honor Code policy that this employee has zero potential for rehabilitation over the course of their entire federal career, I think we can imagine a situation 15 years down the road, 20 years down the road, 30 years down the road, that that employee could easily have been rehabilitated. And I go to more of the comical side of things, but it may not even take that long. We look at Mr. Bindig's prior history here. He's got a history with law enforcement. He's got a history as being a Marine reservist. He's still a Marine reservist. There's never been any disciplinary history whatsoever with respect to his federal career. Mr. Macomb, you wanted to reserve rebuttal time? I did. You can continue if you'd like. The last issue I just wanted to touch upon, and I want to at least save the three minutes, with respect to the agency's own policy, the policy with regards to referral to the Office of Professional Responsibility or Internal Affairs Division, this is exactly why we have that check measure in place. To jeopardize a federal law enforcement officer's career based on a judgment of just one individual as opposed to conducting a full investigation, that's why we have the policy. And if you read the agency's policy, it was not discretionary. They must have referred that case to OPR, and they did not do that here. I reserve the floor. We will give you full three minutes. Thank you. Mr. Long for the government. Thank you, Your Honor. May it please the Court. The choice of penalty here is committed to ATF's sound discretion. There's been no... Mr. Bidnick's cheating was a serious violation of ATF's Special Agent Trainee Honor Code. It's been clearly documented. This court has held law enforcement officers to higher standards of honesty and integrity. That's Watson and the other cases cited in our brief. The Honor Code signed by Mr. Bidnick states that persons aspiring to become ATF Special Agents must exhibit the highest level of personal conduct and integrity. It specifically prohibits cheating. The citing official noted in his decision to remove Mr. Bidnick that cheating violates the Honor Code, which speaks to an employee's integrity. Mr. Bidnick was fully aware of the seriousness and consequences of cheating. It's demonstrated by his receipt of the Code of Conduct and his signing of the Honor Code. He also signed the cover of the exam on which he cheated, which stated that as stated in the Standards of Performance and Code of Conduct, any violations of the Honor Code result... But isn't the question of Giglio impairment one for the U.S. attorney? The question of Giglio impairment is decided on a case-by-case basis. Now, we disagree with Mr. Bidnick's assessment of what the U.S. attorney's manual says. We've quoted in our brief, and it requires prosecutors to take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence. But backing up a little bit, it's important to recognize that the agency is in a position here where it needs to make a decision about its personnel going forward and what this ATF special agent is going to be doing as a criminal investigator in terms of serving warrants, testifying at trial, and otherwise conducting the duties required of his position. It's not... We don't believe that it is plausible that in no event a prosecutor or a judge would ever find this evidence material toward guilt or innocence. Simply put, it's impeachment evidence that is likely to come in regularly. Now, we recognize, as you're suggesting, that it is a case-by-case decision, but ATF needs to make a decision in the range of possible behaviors that might constitute impeaching evidence. We can talk about that, where we might fall, but this is cheating on a training examination to become a special agent. Mr. Bidnick had a clean record up to this point. Yes, sir. And he's now in training for a new position, is that right? Correct, your honor. If he had simply been dismissed from the training program, where would he be now? Well, your honor, the deciding official considered other potential... and nothing more. He would have, what, returned to his old job? Well, your honor, he had changed jobs. He had assumed a new position under a new occupation. So I don't think he would have returned to his prior position. It's a hypothetical. I'm not certain of the outcome. But he was hired as a criminal investigator. He had left his prior work to take that position. So he wasn't even with the agency before, or was he? He was previously with the agency, your honor. But he had applied for and taken a new position. Why couldn't he stay with the agency then? He would have then been required to... He would not have been able to conduct the duties necessary to his position for which he had been hired as a special agent. He would have needed to change jobs. As a special agent, he had to complete the training. Yes, your honor, yes. But there must be some rule that says if you fail to complete the training, you then revert back? Well, here he is. He didn't fail to complete the training for failure to pass the test. Don't argue the merits of whether he did something wrong. Just answer the question. The question is if you don't complete the training satisfactorily, for whatever reason, where do you go then ordinarily? Well, the... I'm just asking a factual question. I'm not certain the answer to that question. Okay, that's a fair answer. You don't know the answer to it. Okay. Yes, your honor. So Mr. Bidnick has pointed out a number of pieces of allegedly mitigating evidence that the agency supposedly ignored. In fact, the deciding official considered Mr. Bidnick's mitigating evidence that he prevented his past work history, his lack of discipline, and the effect of his cheating on his ability to perform. All of these things were considered by the agency. It's true that at the hearing, the deciding official testified that he did not find Mr. Bidnick's potential for rehabilitation to be particularly relevant, but he did consider the evidence that had been put forward by Mr. Bidnick. The gigolo concerns, as I've already said, are real here. It's, of course, a prospective analysis, but the agency should be able to exercise its discretion. We cite in our brief to the non-precedential decision in Rivera v. Social Security Administration, the facts in that case are very similar to the situation. It was cheating on a training examination, and this court upheld the penalty, again, in a non-precedential situation. In sum, Mr. Bidnick created a situation here where there's a very strong likelihood that his testimony would be subject to impeachment. It would have made little sense for ATF to allow Mr. Bidnick to begin work as a criminal investigator, knowing fully well that the U.S. attorney would be unlikely to accept him as a witness, and his testimony would be subject to impeachment. With respect to harmful procedural error, there was no error.  was not required to testify on behalf of Mr. Bidnick. It was not required to refer Mr. Bidnick's case to the Internal Affairs Division. The Code of Conduct sets forth the consequences of cheating. It states that employees may be removed from the academy and terminated from federal service due to honor or integrity violations. It further states that special agent trainees who violate the Code of Conduct may receive disciplinary action, ranging from informal counseling to dismissal, as determined by the chief of the ATF National Academy. You said the referral to the IAD was discretionary? Yes, Your Honor. And, more to the point perhaps, there's been no showing that any procedural error, if there were some, which we of course maintain there was not, was harmful. Mr. Bidnick has the burden on that point. He claims that an investigation would have revealed inconsistencies within the witness' stories, resulted in a completely different penalty. We've seen no showing what those inconsistencies would have, what inconsistencies would have been revealed. And the administrative judge on the board considered all the evidence on that issue presented by Mr. Bidnick and found his arguments without merit. Thank you. Mr. Long? Thank you, Your Honor. Mr. McComber has a couple of... three minutes of rebuttal. Mr. McComber, help me understand something. You made the argument that there's a range of decisions that could have exercised discretion. In evaluating whether the agency and then the board's affirmance of the decision to dismiss, I'm curious as to what the options before the deciding official were. For example, if the deciding official had decided simply to say, you're out of the training program, what would have happened to your client? Do you happen to know? He didn't know. Do you happen to know? There's a couple of different possibilities to that point. If the agency were to remove Mr. Bidnick for his inability to complete the training program, that would have been a completely separate charge of misconduct altogether. That was never alleged here. The only allegation is a single violation of the Honor Code policy. Well, let's assume they found him in violation of the Honor Code policy and they decided that the remedy is to remove him from the training program. Period. What then? At that point, it would have depended on what his prior position was with the agency and I as well am not familiar as to what exactly that position is. There were certain positions in the federal government that have reversion rights. I'm not aware of that. So we don't know what options were actually before the deciding official at that point. Well, as the deciding official even said, the deciding official didn't even consider any other options. In his own testimony, he discusses the agency's policy of progressive discipline and he just goes to the unreasonable standard of removal. Thank you. With respect to a couple of comments here, the agency contends that the penalty is left to the sound discretion of the agency. That's not correct. When the agency selects a penalty that is grossly disproportionate, this court, the board, may go back and order a lesser penalty. There's plenty of cases where the board's gone back and ordered a lesser penalty based upon an inappropriate balancing of the Douglas factors. So the agency, while they may be entitled to some discretion there, their decision is not ultimate. It may not be ultimate, but it usually isn't reversed. It is not always reversed, but there is plenty of cases out there where they have reversed decisions based on a single violation of misconduct there where the agency selects a penalty that is so grossly disproportionate. With respect to the policy, I think it's a very important distinction to look at this IAD policy versus the trainee program. You have a very specific policy that applies to integrity violations, impartiality, and professionalism. And then you have a very general policy that applies to trainees that that may encompass all types of misconduct, being late for work, assaults, any other allegations there. Now, those allegations may rest with the chief here, but you have a very specific policy. Integrity violations, impartiality, and professionalism must be sent to IAD for proper investigation. There was a clear procedural error, and if you look at the record as a whole, I think there is certainly evidence of harmful error. The only statements that were taken were from two of the witnesses. Mr. Bidnick was never given the opportunity at the investigation stage to explain himself, talk to the other trainees, and develop that record in much more detail. Unfortunately, we don't have that investigation, so we're at a disadvantage when we're looking at the facts to support that harmful error. Thank you very much. Thank you, Mr. Macomber. We'll take the case under advisement.